*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

JULIE ANN ZIMMERMAN,

        Defendant-Appellant.

UNPUBLISHED
March 10, 2026
1:45 PM

No. 366517
Newaygo Circuit Court
LC No. 2022-013068-FH

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

Defendant appeals as of right her conviction of perjury committed in a court proceeding, MCL 750.422, for which she was sentenced, as a third-offense habitual offender, MCL 769.11, to 13 months to 30 years' imprisonment. On appeal, defendant argues: (1) the prosecution presented insufficient evidence to convict her of perjury; (2) trial counsel was ineffective for failing to admit the transcript of the forfeiture hearing at which defendant perjured herself; and (3) the trial court abused its discretion in admitting impermissible character evidence, or alternatively, trial counsel was ineffective for failing to properly object to the character evidence. We affirm.

## I. FACTS

Defendant and her husband, John Zimmerman (John) lived on a farm where they owned and boarded several horses. In 2019, defendant posted several horses for sale on Facebook.

Colleen Egleston responded to defendant's advertisement about a gelding named Duke. When Egleston visited defendant's home, she noticed her horses were very thin and contacted Newaygo County Animal Control out of concern.

On Tuesday, December 17, 2019, Newaygo County Chief Animal Control Officer Kevin Carr visited defendant's property to investigate the horses' condition. Carr later obtained a search warrant for defendant's property, which allowed for "removal of the animals, computers, phones, electronics, and files."

Two days later, on Thursday, December 19, 2019, Carr executed the search warrant. Animal Control Officer Jamie Wiseley and Newaygo County Sheriff's Department personnel, including Deputies Preston Peacock and Bunnita Ouwinga, assisted Carr.

At 10:53 a.m., Carr knocked on defendant's front door, identified himself as being from the Sheriff's Department, and announced he had a search warrant. According to Carr, he knocked and announced "very loud[ly]." Wiseley described the knock as "[v]ery forceful, loud." After Carr knocked on the front door, Peacock also knocked on the side window of the front porch. Ouwinga could hear Carr and Peacock knocking from where she was, "around the back side and the side of the house looking at the animals."

At 10:57 a.m., Wiseley used a blocked telephone number to call defendant. Wiseley reached a voicemail and heard defendant's voice directing her to call two other telephone numbers. Wiseley called both numbers. At one, she left a voicemail message. At the other number, someone who sounded like a man answered, but when Wiseley asked who it was, the person responded "Sarah," before the call disconnected.

When no one came to the door, the officers began to load between 15 and 18 horses into two stock trailers. The officers all testified the seizure was extremely loud because of the trailers' structure, including the metal slats on their sides, a wooden floor, and a heavy gate. Moreover, the horses were stressed and made a lot of noise.

After about 10 minutes, Carr was ready to depart with the first trailer of horses, including two horses that were going directly to the veterinarian for examination. Even so, Carr stopped to knock on defendant's door a second time. He again announced he was from the Sheriff's Department with a search warrant.

At 11:16 a.m., while officers were loading the second stock trailer, defendant came outside. Wiseley asked defendant if she had just arrived home, which defendant denied, asserting she had not heard the officers because she had been in the shower. Peacock found this odd because defendant was fully clothed and her hair was dry.[1]

After the animals were seized, officers continued to execute the search warrant inside defendant's home, recovering cellular phones and a "large computer tower." Newaygo Sheriff's Department Detective Sergeant Ray Lundeen later attempted to download information from three cellular phones and a computer tower. Lundeen was only able to extract information from one of the cellular phones, generating a report consisting of text messages and call logs.[2]

---

[1] Defendant later testified that she partially blow-dried her hair.

[2] Lundeen was unable to download any information from the other two phones because one was water-damaged, and the other was factory reset. The computer tower had not been used since 2008.

During the seizure, defendant's cellular phone records reflected the following incoming and outgoing calls and text messages:

- 10:55 a.m. – Outgoing call to Sarah Haven, lasting 27 seconds.

- 10:55 a.m. – Outgoing call to John, lasting 31 seconds.

- 10:58 a.m. – Incoming call from blocked number that was not answered.[3]

- 11:01 a.m. – Incoming text from John, stating, "She is not responding."

- 11:03 a.m. – Outgoing text to John, stating: "Keep teying [sic]."

- 11:04 a.m. – Incoming call from Haven, lasting 27 seconds.

- 11:04 a.m. – Incoming text from John, stating: "I am.  Did they stop?"

- 11:06 a.m. – Outgoing text to John stating: "Yep.  They are in the yard.  I'm in the bathroom."

- 11:06 a.m. – Outgoing call to Eva Deems that went unanswered.

- 11:07 a.m. – Outgoing call to Deems, lasting 42 seconds.

- 11:08 a.m. – Outgoing text message to Deems, stating: "Tell them you own Legacy and Tipsy.  You bought them Monday."[4]

- 11:09 a.m. – Incoming call from Haven lasting 1 minute and 9 seconds.

- 11:10 a.m. – Incoming text from Deems, stating: "Okay."

- 11:14 a.m. – Incoming text from Deems stating: "Do you want them to know you are there?"

- 11:15 a.m. – Outgoing text to Deems, stating: "I'm going outside right now. Pkease [sic] hurry."

- 11:17 a.m. – Outgoing call to Haven, lasting 20 seconds.

---

[3] This was consistent with Wiseley's initial attempt to contact defendant.

[4] The contracts produced for the sale of these horses from defendant to Deems were dated Wednesday, December 18, 2019, the day before the seizure.

• 11:17 a.m. – Outgoing call to John, lasting 9 seconds.

• 11:17 a.m. – Incoming text from Deems, stating: "On the way."

• 11:18 a.m. – Incoming call from John, lasting 1 minute and 2 seconds.

• 11:33 a.m. – Incoming text from Wayne, stating: "Okay.  1, 2, 3."

At some point during the seizure, Haven arrived at defendant's property and told Carr she owned four of the horses: Dexter, Sarafina, Willie, and Maisie.  Haven asserted she had purchased them the previous night.

Later, at about 3:00 p.m., defendant called Egleston from Haven's phone, reportedly stating: "They're here right now and they are taking my horses.  They're taking my horses off the property."  Egleston described defendant as "frantic."  Defendant believed Animal Control was seizing her horses because they were "out to get" her.  Egleston countered that defendant's horses were "very, very thin and in really bad shape," and noted defendant previously mentioned "that one horse had died of emaciation."  Defendant requested Egleston call Animal Control to take ownership of the horses, but Egleston refused, and reported defendant's actions to law enforcement.

Thereafter, defendant was charged with felony abandonment/cruelty to animals given  the horses' condition.  And, on March 10, 2020, a civil forfeiture hearing was held to establish ownership of the seized horses.  Defendant, John, Haven, and Deems were all listed as defendants. John claimed ownership of two of the seized horses, Jewels and Alex; Deems claimed ownership of Legacy and Tipsy, asserting she purchased these horses before the seizure.  At that time, defendant pleaded no contest to misdemeanor abandonment/cruelty to animals, MCL 750.50(4)(a), in exchange for dismissal of the felony charge.  Defendant also agreed to forfeit her rights to any horse in Animal Control's custody, and to never possess or own a horse again.

During the forfeiture hearing, Egleston testified about her telephone conversation with defendant on the day of the seizure.  To impeach Egleston's testimony, Haven and Deems sought to take testimony from defendant, at which point the trial court noted that defendant's testimony would be subject to perjury.  Thereafter, defendant testified[5]:

> *A.*  I did tell [Egleston] that if she PayPaled the money like she did the—the week or the night before, she promised the week before, then she said she was PayPaling the money.  I said, if you PayPal the money, I said then in my eyes you own the horse and you need to contact animal control.  I did not get the sales contract returned signed from you after I sent you the sales contract and his medical

---

[5] Although the forfeiture hearing transcript was not part of the lower court record, defendant has attached it as an appendix to his appellate brief.  Given the issues presented, we take judicial notice of this transcript.  See MRE 201(b) and (c).  See also *People v Snow*, 368 Mich 586, 591; 194 NW2d 314 (1972) (taking judicial notice of trial court records in other cases based on the "one court of justice" concept in Michigan's Constitution, Const 1963, art 6 § 1).

records and proof of his registration paper. Which she just testified she never got and it would be part of the police report with her messages between me and her that she was forwarded all of that.

\* \* \*

*Q.* When you made the call to Ms. Egleston, had she bought the horse from you?

*A.* I did not know at the time. I asked her if she had PayPaled the money like she had promised the night before and if she had e-mailed back the contract. Because if she had, in my opinion, she had owned the horse at that time and she could go to animal control. If not, she was out of luck cause she was worried about if she would still get the horse. She had not as of the night before when I had messaged with her, PayPaled the money or returned the contract.

I had forwarded her proof of [C]oggins,[6] vet records, medical records, a copy of his registration form and I did have to e-mail it to her also.

*Q.* Okay.

*A.* And so I had not received anything back the night before. I told her if she had, then in my opinion she had owned the horse. And I told the officers, Officer Wiseley, when she was loading one of the donkeys, that I was supposed to have already had the deposit on those animals and she told me to have the woman contact her then.

*Q.* But you didn't have the deposit yet, correct?

*A.* I did not know. I had been up that morning, did chores early, went to sleep, and I had no phone, I had no computer. I had not even checked it that day. I was going to check it before [Egleston] came. She was gonna — \* \* \*

*Q.* How long did you say you had your phone after animal control started? You already testified to this. I just want to—

*A.* Maybe 15 minutes.

*Q.* Okay. How did you know that animal control was there?

---

[6] "In Michigan, horses six months or older must have an equine infectious anemia (EIA) test, also known as a Coggins test, with a negative result, completed within the past 12 months. This test is required when they are . . . relocated due to ownership changes. . . ." <https://www.michigan.gov/-/media/Project/Websites/mdard/documents/animals/exhibitions/exhibition_rack_horse.pdf?rev=8 65cdd7bdf104b57afed16c0c5d7e6b8#:~:text=In%20Michigan%2C%20horses%20six%20month s,or%20sold%20at%20an%20auction> (accessed February 25, 2026). See MCL 287.726a.

-5-

*A*. When I walked out.

*Q*. Okay. You didn't know before that?

*A*. I saw an off—or a patrol car go by and I called my husband about it, and we had just gotten the power on, I was getting in the shower, and then when I looked out the window, I heard noise and I saw officers. So I walked out, and I only saw officers standing in the back yard. I walked out at that time.

\* \* \*

*Q*. You didn't know animal control was there until you looked outside and then walked out the door?

*A*. Yup, correct.

At the conclusion of the forfeiture hearing, the court determined that no one but defendant had a verifiable ownership interest in the horses.

About two- and one-half months later, on May 28, 2020, Haven went to the Animal Control Office to report that defendant still owned horses. Carr and Lundeen questioned Haven about her forfeiture hearing testimony, and she eventually admitted to lying about owning the horses.

Thereafter, defendant was charged with one count of perjury. At trial, the prosecution offered three separate theories to support the perjury charge: (1) defendant testified that she "was unaware that animal control was present at her property until she saw them out the window and walked out the door," (2) defendant testified that "she did not know if Ms. Egleston had bought the horse from her when she called Ms. Egleston," and (3) defendant testified that she "had no phone and no computer in [sic] the morning of the seizure."[7]

At defendant's perjury trial, Haven testified that she and defendant were no longer friends.[8] Without an agreement for her testimony, Haven admitted her earlier forfeiture hearing testimony

---

[7] After the prosecution rested, the trial court granted defendant's motion for a directed verdict on the second theory given the exchanges between defendant and Egelston; however, the court allowed the case to proceed to the jury on the remaining two theories. The court also granted defendant's motion for a directed verdict on a second charge against defendant related to Haven, namely, willfully impeding, interfering with, preventing, or obstructing the ability of a witness to attend, testify, or provide information in or for an official proceeding or attempting to do so. See MCL 750.122.

[8] On the day that Haven went to Animal Control to report defendant, she learned that defendant had reported her. Carr and Wiseley investigated defendant's allegations against Haven later that same day, determined that Haven's horses were fine, and said that defendant's report was just a vindictive act.

was not truthful. Haven testified that both defendant and John contacted her the day of the seizure, asking her to come over as soon as possible because Animal Control was there taking the animals. Haven also testified that defendant reported that she was in the bathroom, that Animal Control was there, and that she was attempting to avoid them. Defendant wanted Haven to tell the officers that Haven owned "three or four" of the horses, while Deems owned some of the others.

Later, defendant prepared and backdated contracts to reflect that Haven had purchased the horses the day before the seizure when, in fact, Haven had signed them after the seizure occurred. Haven identified four such contracts, which the trial court admitted. Haven denied ever purchasing the horses from defendant, recognizing that she had earlier purchased a horse from defendant for which she believed she had signed a contract..

Haven testified, and Carr confirmed, that he had met with her a day or two before the seizure. At that time, Haven informed him that she owned the bay mare at defendant's property.

During trial, the parties stipulated to defendant being placed under oath when she testified at the forfeiture hearing. And Lundeen read portions of defendant's civil forfeiture hearing testimony hearing that were used to support the perjury charge into the record.

During defendant's criminal trial, defendant testified about what transpired on the day of the seizure. She drove John to work at about 2:00 a.m. and returned home to discover she had no power.

The power was restored at about 10:41 a.m., and defendant took a shower. When defendant got out of the shower, she heard talking outside and observed two uniformed officers walking in her yard.[9] Defendant recognized Ouwinga as a sheriff's deputy but did not see Carr, whom she knew to be an Animal Control officer. Defendant did not see any vehicles from her bathroom window and explained that the spot where Carr parked the Animal Control vehicle and trailer was blocked from her view by an addition to her house and a large shed. Defendant said that she did not go outside to speak with the officers because: "Animal [C]ontrol requested some information and our attorney was going to forward it and I was told not to talk to them."[10]

---

In 2021, Haven also sued defendant over a saddle that Haven purchased from defendant, but which defendant had kept.

[9] Confronted with her forfeiture hearing testimony that she was getting in the shower when she looked out the window, heard a noise, and saw the officers, defendant said it was *after* she got out of the shower. Defendant explained that she must have misspoken at the forfeiture hearing.

At the forfeiture hearing, defendant said that she heard a noise and walked outside. At trial, defendant testified that she had a towel on and got dressed before she went outside after hearing the noise.

[10] After Carr met with defendant on the 17th, defendant met with her attorney to seek advice about revealing the names of owners who boarded horses on the property to Animal Control.

Defendant did not believe the noises from the seizure could be heard inside her house, and she did not hear Carr and Peacock knocking over the sounds of her running shower, the fan, and the heater. Defendant did not recall ignoring Wiseley's telephone call and asserted it may not have "come through" because of her rural location.

Defendant denied that she knew the officers were from Animal Control when she was making calls and sending text messages. Defendant explained: "I did not know that they were there. I suspected that they may be because the attorney advised me that they may try that, but I had no proof until I went outside, and even they escorted me back to the house at the time before I saw animal control." According to defendant, she first became aware the officers were from Animal Control when she went outside. Defendant explained that Peacock confiscated defendant's cellular phone and informed her of the search warrant. A few minutes later, defendant had her first contact with an Animal Control officer when Wiseley came around the corner.[11]

Confronted with video from the seizure, defendant recognized that Peacock did not immediately seize her phone. Instead, while outside, defendant made calls to both Haven and John before her phone was seized. And, during what defendant believed to be her call to John, she said: "Hey, they're here. They've got a warrant. They're taking the animals[.]" Defendant recognized that she was mistaken and that her "timeline" was "a little confused" because video also reflected that she saw Wiseley before Peacock seized her phone.

Regarding her previous testimony about not having a phone or computer, defendant explained that the prosecutor had asked her about e-mail and PayPal. Defendant did not mean that

---

[11] Wiseley testified that she did not see defendant come out of the house; however, at 11:16 a.m., she saw defendant walking up the pathway between the garage and the house. Wiseley asked if defendant had just arrived home. Defendant said that she had been there, but was in the shower getting ready to go to school. When Wiseley asked defendant what school she was going to, defendant clarified that she meant her son's school "to go pick him up." When defendant testified, she said it was hours before she was allowed to leave and her "son was supposed to get out of school at 2:30" p.m.

Wiseley also testified that while the officers were loading the animals, defendant asked what they were doing. Wiseley explained that "we . . . got a search warrant to remove all the animals from the property." Defendant wanted to know if they were taking all of them, which Wiseley confirmed. Defendant then said that "there were a couple horses that . . . weren't hers. . . ." Wiseley said that they were taking those as well and that defendant "could have the owners contact us."

Wiseley explained that when Animal Control was at defendant's property earlier, defendant told them that three horses belonged to Haven and one horse belonged to Isabel Ramirez. On the 19th, however, only one of Haven's horses was there along with Ramirez's horse.

While talking to Wiseley during the seizure, defendant mentioned that "a woman [Egleston]" was coming to pick up three other animals at 4 p.m. on the day of the seizure. Defendant said a deposit had been put down on them. No one arrived at that time, and no one contacted Wiseley about needing to pick up those animals.

she did not have a phone or computer; instead, defendant meant that she did not have internet access to check those accounts to determine whether Egleston had followed through with a payment.

When defendant was allowed to leave her property several hours later, she used Haven's cellular phone to access her Facebook Messenger. Defendant retrieved Egleston's number and called Egleston from Haven's cellular phone, explaining the seizure to her and discussing their purchase agreement.

According to Egleston, any promise of payment she made to defendant was solely to keep the horses on defendant's property because she had no intention of purchasing a horse from defendant. Egleston explained that Animal Control officers had said that defendant "has a habit of once she knows that we're on to her, she will move those horses to a different location so we can't seize them or even make a case," because she "has a history of this." Egleston said that she had "never seen horses so debilitated, so thin, so abused, and so neglected in [her] life."

The jury convicted defendant of a single count of perjury in the courts supported by two separate theories. This appeal followed.

## II. INSUFFICIENT EVIDENCE OF PERJURY COMMITTED IN COURTS

Defendant argues there was insufficient evidence to convict her of perjury committed in courts because she did not lie during the forfeiture hearing. We disagree.

This Court "review[s] de novo a challenge to the sufficiency of the evidence." *People v Baskerville*, 333 Mich App 276, 282; 963 NW2d 620 (2020). On appeal, the evidence is viewed "in a light most favorable to the prosecut[ion] to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (quotation marks and citation omitted). "The standard of review is deferential; a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted).

"The sufficient evidence requirement is a part of every criminal defendant's due process rights." *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). "[D]ue process requires the prosecution to prove every element beyond a reasonable doubt." *People v Oros*, 502 Mich 229, 240 n 3; 917 NW2d 559 (2018). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999), reh den 461 Mich 1205 (1999) (quotation marks and citation omitted).

Defendant was convicted of one count of perjury committed in courts, MCL 750.422,[12] for testifying that (1) she did not know Animal Control was on her property until she walked outside

---

[12] MCL 750.422 provides:

to talk to officers, and (2) she did not have a telephone or computer on the morning of the seizure. Perjury is defined as "a willfully false statement regarding *any* matter or thing, if an oath is authorized or required."[13] *People v Lively*, 470 Mich 248, 253, 258; 680 NW2d 878 (2004). M Crim JI 14.1 delineates the necessary elements:

> [1] First, that the defendant was legally required to take an oath in a proceeding in a court of justice. [An oath is a solemn promise to tell the truth.]
>
> [2] Second, that the defendant took that oath.
>
> [3] Third, that while under that oath the defendant made a false statement. The statement that is alleged to have been made in this case is that [*give details of alleged false statement*].

The parties stipulated that defendant was placed under oath when she testified to these statements during the civil forfeiture proceeding, and those elements are not disputed on appeal. Defendant challenges whether sufficient evidence was presented to demonstrate her statements were false.

Perjury requires the prosecution "to prove that the allegedly perjurious statement is false." *People v Kozyra*, 219 Mich App 422, 429; 556 NW2d 512 (1996). "The prosecution cannot satisfy its burden simply by contradicting the defendant's sworn statement. Rather, the prosecution must present evidence of circumstances bringing strong corroboration of the contradiction." *Id.* (quotation marks and citation omitted).

Regarding the first statement, defendant contends it is necessarily true because she could not confirm the officers were from Animal Control until walking outside and speaking with them. Notwithstanding defendant's semantic argument, the prosecution presented sufficient evidence to demonstrate defendant knew Animal Control officers were on her property before she walked outside.

Animal Control officers had been to defendant's property on Tuesday, December 17 about Egleston's complaint. Thereafter, defendant conferred with a lawyer, who had advised her not to be alone with Animal Control and that a seizure might occur.

At 10:53 a.m., on Thursday, December 19, Animal Control Officer Carr began knocking on defendant's door, announcing the presence of the Sheriff's Department with a search warrant. Peacock also loudly knocked and announced. Despite defendant's assertions at trial she could not hear anything due to running a shower, fan, and heater, Deputy Ouwinga heard the knocking on

---

> Any person who, being lawfully required to depose the truth in any proceeding in a court of justice, shall commit perjury shall be guilty of a felony, punishable, if such perjury was committed on the trial of an indictment for a capital crime, by imprisonment in the state prison for life, or any term of years, and if committed in any other case, by imprisonment in the state prison for not more than 15 years.

[13] [13] Materiality is not an element of perjury. *Lively*, 470 Mich at 253-254.

the back side of the house. Moreover, both Animal Control and Sheriff's Department officers' testimony and on-scene video showed that the knocking and the noises arising from the seizure was generally very loud.

Within two minutes, defendant's phone records show that she began making phone calls and sending texts over the next 24 minutes. At 11:04 a.m., John texted defendant: "Did they stop?" At 11:06 a.m., defendant replied: "Yep. They are in the yard. I'm in the bathroom." From these text messages, it is reasonable to infer defendant and John were referring to the officers knocking.

While defendant denied that she knew that the officers were from Animal Control during this period, the officers were in the process of loading the horses into the stock trailers. Therefore, it is reasonable to infer if defendant was aware of the officers' presence in her yard because that is what she told her husband. Moreover, given the information provided by her attorney, it is also reasonable to infer that she was aware they were seizing the animals.

Shortly thereafter, defendant texted Deems, her babysitter and accountant, to tell "them" that she owned Legacy and Tipsy, and that Deems "bought them Monday." Deems asked whether defendant wanted "them to know [she] was there?" Defendant claimed she was "going outside right now" and asked Deems to hurry. Deems later claimed that two horses belonged to her.

During the seizure process, defendant also had four telephone conversations with Haven. Haven testified that defendant asked her to come over as soon as she could because Animal Control was there taking the animals. Defendant also reported being in the bathroom and trying to avoid Animal Control. Defendant asked Haven to say that some of the horses were Haven's and some belonged to Deems. At that point, Haven only had a bay mare on defendant's property. Moreover, just a day or two before the seizure, Carr came to Haven's house and Haven told him that she owned only the bay mare. Even so, when Haven arrived at defendant's house on the day of the seizure, she falsely claimed that she owned four additional horses. Haven had no deal with the prosecutor's office for her trial testimony against defendant.

Viewed in a light most favorable to the prosecution, the direct and circumstantial evidence, and reasonable inferences drawn therefrom, were sufficient to support defendant's perjury conviction for her testimony during the forfeiture hearing that she did not know Animal Control was on her property until she walked outside to talk to the officers.

Moreover, the evidence viewed in the light most favorable to the prosecution supported defendant's perjury conviction based on her forfeiture hearing testimony that she did not have a telephone or computer on the morning of the seizure. The evidence showed that the Sheriff's Department officers, who assisted Animal Control in executing the search warrant, seized three cell phones and a computer tower. Further investigation showed that defendant used one of those phones to communicate with John, Haven, and Deems during the execution of the search warrant. Accordingly, defendant is not entitled to appellate relief on this claim.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant next contends that trial counsel was ineffective for failing to admit the transcript of defendant's six-page testimony from the civil forfeiture hearing to place in context defendant's statement that she did not have a telephone or computer on the morning of the seizure. Although

we agree that trial counsel performed deficiently, we conclude that defendant has not established that she was prejudiced because the jury also convicted her of perjury based on separate testimony she gave during the forfeiture hearing.

Defendant preserved this issue for appeal because she filed a motion for remand, seeking a hearing to admit the civil forfeiture transcript into the circuit court record and to have it assess the reasonableness of trial counsel's actions. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). But because a separate panel of this Court denied defendant's motion,[14] our review is limited to mistakes apparent on the record.[15] *Abcumby-Blair*, 335 Mich App at 227.

A claim of ineffective assistance of counsel "presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). The United States and Michigan Constitutions entitle a criminal defendant to assistance of counsel. US Const, AM VI; Const 1963, art 1, § 20. Counsel must be effective to satisfy the constitutional requirement. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "Effective assistance of counsel is strongly presumed, and the defendant bears the heavy burden of proving otherwise." *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021) (quotation marks and citations omitted). "In order to obtain a new trial because of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that [the] outcome would have been different." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023) (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

To show trial counsel's performance failed to meet an objective standard of reasonableness, "a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014) (quotation marks and citation omitted). "If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *Haynes*, 338 Mich App at 429-430. However, the strategy "in fact must be sound, and counsel's decisions as to it objectively reasonable; a court cannot insulate the review of counsel's performance by calling it trial strategy." *Douglas*, 496 Mich at 585 (quotation marks and citation omitted).

During the forfeiture hearing, defendant testified to contradict Egleston's testimony about their telephone conversation the day of the seizure. Defendant explained that Egleston agreed to purchase a horse and was supposed to send the payment via PayPal the night before the seizure. Defendant called Egleston because she believed that if Egleston had already paid for the horse via PayPal, she was the lawful owner and needed to contact Animal Control. The prosecutor asked

---

[14] Another panel of this Court denied defendant's motion. *People v Zimmerman*, unpublished order of the Court of Appeals, entered July 17, 2025 (Docket No. 366517).

[15] See footnote 5.

whether Egleston had purchased the horse at the time of the telephone contact. Defendant explained she did not know, but as of the night before the seizure, she had not received a PayPal from Egleston. Defendant stated she told Officer Wiseley this information during the seizure, at which point the prosecutor asked:

> *Q*. But you didn't have the deposit yet, correct?
>
> *A*. I did not know. I had been up that morning, did chores early, went to sleep, and *I had no phone, I had no computer*. I had not even checked it that day. I was going to check it before [Egleston] came. She was gonna — [(emphasis added).]

The prosecution charged defendant with perjury, relying in part on her statement about not having a phone or a computer the morning of the seizure.

During defendant's perjury trial, only portions of her forfeiture hearing testimony were read into the record. Defendant argues without the entirety of her civil forfeiture hearing testimony, the jury missed critical context showing she did not commit perjury. For example, at the outset of defendant's forfeiture hearing testimony, which was not read during the perjury trial, defendant explicitly stated that she had her cellular phone when the seizure began:

> *Q* [Deems]. [Defendant], during the seizure, when did you have telephones?
>
> *A*. I only had telephones from probably the first ten or 15 minutes.

According to defendant, after those first 15 minutes, she did not have access to a cellular phone to call Egleston until she was allowed to leave her property.

Moreover, this exchange, which was not read during the perjury trial, immediately follows defendant's "no phone, no computer" testimony:

> *Q* [The prosecutor]. You had not been on your phone that day prior—
>
> *A*. I had not been on to check it.
>
> *Q*. To check what?
>
> *A*. If she had e-mailed any of that back.
>
> *Q*. So you had nothing on your e-mail that day?
>
> *A*. I had not been on the e-mail to see if she sent that back, no.

Another exchange from the forfeiture proceeding, not read into the record at defendant's perjury trial, was:

> *Q* [The prosecutor]. [Defendant,] you understand I can see everything you did on your phone that day, correct?

-13-

* * *

     *A.* Yeah, you have – you have my phone.

* * *

     *Q.* You understand I can see everything you did on your phone that day, correct?

     *A.* Yeah. And I did not check e-mails throughout the whole day. If I did in the morning, it was not there. I – I don't recall checking it. I just know it wasn't there the night before but I just told her if you sent back it [sic] and you PayPaled the money – I do not believe I checked PayPal that day cause [sic] I expected to hear back from her.

A fair reading of the entire forfeiture hearing testimony reflects that defendant was referring to lack of internet access to her e-mail when she testified: "I had no phone. I had no computer." And during defendant's perjury trial, defendant testified that she was referring to lack of internet access during her forfeiture-hearing testimony. Specifically, defendant did not have power when she woke up the morning of the seizure, and without internet access, she had not checked her e-mail or PayPal account to see whether Egleston had submitted a deposit.

Read literally, defendant's statement that she had no phone or computer on the morning of the seizure is plainly false. But, viewed in context, it is just as plain that defendant was not testifying she did not physically have a telephone or computer[16] in her possession on the morning of the seizure. See *People v McCann*, 42 Mich App 47, 50; 201 NW2d 345 (1972) ("The whole transcript does not bear that measure of wilful untruth under oath" which is the essence of perjury.) Consequently, trial counsel's failure to support defendant's trial testimony by admitting her forfeiture hearing transcript to establish this context was objectively unreasonable.

However, the prosecution argues that trial counsel had strategic reasons for failing to admit this portion of the forfeiture hearing transcript because it further supported her perjury charge. By way of example, the prosecution cites to this testimony:

     *Q* [Deems]. [Defendant], during the seizure, when did you have telephones?

     *A.* I only had telephones from probably the first ten or 15 minutes.

---

[16] Lundeen testified that defendant's computer tower had not been used since 2008. And "more than a decade ago the [United States] Supreme Court recognized that because cell phones have such large storage capacities, they are essentially mini computers . . . ." *People v Evans*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 371021); slip op at 5. See e.g., MCL 750.145d(9)(a) ("Computer includes . . . a cellular telephone . . . .")

-14-

*Q.* Did you have any cell phone, any way to contact anyone during that seizure after that time?

*A.* Not until after I left the property and I borrowed [Haven]'s cell phone when she was in the vehicle with me.

*Q.* Okay. What time did you finally leave the property?

*A.* I'm gonna say 5:00 or six o'clock maybe, maybe even 4:00.

*Q.* So is there any way that four o'clock during the seizure you had the ability to make a phone call to this, I'm sorry, I don't know what her name is.

THE COURT: Egleston.

* * *

Q. Ms. Egleston?

*A.* I did make a phone call approximately an hour after I left with Sarah in the vehicle using Sarah's phone.

*Q.* Okay. But not during the seizure?

*A.* No.

From the prosecutor's perspective, because defendant did not mention her earlier phone calls with John, Haven, and Deems, it was reasonable for trial counsel to believe that the jury would have looked unfavorably on these omissions. This argument, however, ignores that the purpose of defendant's forfeiture hearing testimony was to impeach Egleston regarding their phone conversation. Defendant was not being questioned regarding her other telephone activity. And, in any event, defendant acknowledged in this testimony that she had her cellular phone at the beginning of the seizure.

The prosecution also asserts that defendant's phone records clearly refute her testimony that she only had her cellular phone for those first 15 minutes, further supporting her perjury charge. Again, defendant's phone records show she used her phone from 10:55 a.m. until she received a phone call lasting one minute, two seconds at 11:18 a.m., for a total of about 24 minutes. Defendant never denied this phone activity, and underestimating the amount of time that she actually possessed her phone by nine minutes after she used the qualifier "probably" does not establish an intentional lie amounting to perjury. See *McCann*, 42 Mich App at 49-50 ("Every self-contradiction by a witness in the heat of a contested trial is not perjury.").

Further, we disagree with the prosecution's assertion that trial counsel's agreement with failing to fulfill the jury's request for a transcript was a reasonable trial strategy. While deliberating, the jury asked: "May we see the transcript with the original question to where [defendant] . . . has the dialogue from the March trial about having a phone in regards to the perjury?" Recognizing that the forfeiture hearing transcript had not been admitted, the court

-15-

recognized that it had two options: (1) have the jury listen to the testimony that was read into the record or (2) "give them the transcript – that portion of the transcript." The prosecutor advocated for the first option but said that if the defense wanted the jury to have the transcript, it could. The prosecutor added that she did not admit the transcript because "there was a lot of back and forth and things in that transcript that [she thought were] probably not necessary nor appropriate." The court responded that it was not considering admitting the whole transcript, only what led up to defendant's testimony that she did not have a phone. Eventually, defense counsel stated that he preferred to give the jury certain pages from the forfeiture hearing transcript, reading parts of it into the record. Defense counsel reasoned: "[T]hose are both kind of before and after, so it gives the context to it." After further discussion, the prosecutor stated that she had no objection to it, but was concerned because she did not recall exactly what portions of the forfeiture hearing transcript were read into the record during defendant's perjury trial. The prosecutor then sought to have defense counsel waive any objection to the jury receiving information that had not been provided during trial. The trial court said that it was not going to provide the jury with more information from the forfeiture hearing than had been read during the perjury trial. The court recessed to review Detective Lundeen's testimony. Upon its return, the court read the jury's question as relating to the prosecutor's question from the forfeiture hearing transcript that Lundeen had read during the perjury trial. The trial court said that it would provide a note, reading: "[T]his is the question that immediately preceded the answer about not having a phone[:] 'But you didn't have any deposit yet. Correct?' " When court asked the parties whether they had any objection, the prosecutor had none and defense counsel answered: "No."

Our review of the jury's question reflects that it wanted the forfeiture hearing transcript to provide context for defendant's statement that she had no phone or computer. Again, during the perjury trial, defendant testified that her forfeiture hearing testimony about having no phone or computer related to her lack of internet access to check whether Egleston had emailed a PayPal deposit. And in defendant's closing, defense counsel argued that the prosecutor, who was present at the forfeiture hearing, had pounced on the "no phone and computer" statement, but that was not "what [defendant] was saying." Counsel then pointed out that there was "no . . . follow-up on that in the [forfeiture hearing] transcript." For example, there were no questions about what defendant meant, why she did not look, or when she looked.

At that point, the prosecutor objected because such testimony "was not in evidence," and the trial court agreed. Thereafter, defense counsel returned to his argument that prosecution had taken the words "[n]o phone and no computer" and "put it in a vacuum." Defense counsel further argued that Detective Lundeen testified that a person might not have access to email but could still receive phone call and send text messages. Later, defense counsel also argued:

> I don't think she thought [] in a million years that one sentence, "I had no phone and computer[,]" . . . were [sic] going to come back and be a felony charge for her. I think she would have liked the opportunity to explain that.

In sum, although defendant herself testified about how she perceived the prosecutor's questions during the forfeiture hearing which led her to testify that she had no phone or computer, defense counsel failed to support defendant's testimony with the very forfeiture hearing testimony that placed it in context. Because there was no strategic reason for defense counsel's failure to do so, counsel performed deficiently in this regard.

Even so, defendant is not entitled to a new trial. To obtain relief based on ineffective assistance of counsel, a defendant must also show "but for counsel's deficient performance, there is a reasonable probability that [the] outcome would have been different." *Yeager*, 511 Mich at 488 (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks and citation omitted). As already discussed, sufficient evidence was presented to support the jury's determination that defendant falsely testified she did not know Animal Control was on her property until she went outside. One false statement is sufficient to sustain defendant's perjury conviction. See *Lively*, 470 Mich at 253.

Defendant, however, asserts if the jury had been provided with the forfeiture hearing transcript, it would have understood that defendant was not lying because she knew officers were on her property. But this fact is not in dispute. Indeed, defendant's entire sufficiency argument is that she knew that the officers were present but she could not be certain that they were specifically Animal Control officers until she actually encountered one. But this portion of defendant's forfeiture hearing testimony was read during her perjury trial and she does not explain how having the forfeiture hearing transcript would provide additional context. Accordingly, providing the jury with the forfeiture hearing transcript would not have affected its decision to convict defendant of perjury regarding the presence of Animal Control. Because defendant cannot show that there is a reasonable probability of a different outcome at trial, her ineffective-assistance claim fails.

## III. IMPROPER CHARACTER EVIDENCE

Defendant argues the trial court abused its discretion by admitting character evidence that defendant "abused animals" and "lied about contracts." To the extent that trial counsel did not object, defendant contends that counsel performed ineffectively.

### A. PRESERVATION AND STANDARD OF REVIEW

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019), citing MRE 103(a)(1). Defendant's single citation in her brief supporting her preservation argument is to trial counsel objecting to questioning regarding the horses' health. In the statement of facts, however, defendant acknowledges that trial counsel objected, "arguing that the question wasn't relevant." At no point did trial counsel challenge the testimony as improper character evidence, and an objection on one ground is usually insufficient to preserve an issue on a different ground. See *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004).

Further, defendant failed to support her preservation argument with citations to the record. See MCR 7.212(C)(7) ("Page references to the transcript, the pleadings, or other document or paper filed with the trial court must also be given to show whether the issue was preserved for appeal by appropriate objection or by other means."). Although her statement of facts cites generally to the admitted contracts and to testimony accusing her of forging contracts, defendant fails to provide any record citation indicating where trial counsel allegedly objected to the contract-forgery evidence. Because defendant never raised a character-evidence challenge in the trial court, her claims are not preserved.

"When a party raises a separate argument on appeal than the party raised before the trial court, the party must satisfy the standard for plain-error review." *People v Swenor*, 336 Mich App 550, 562; 971 NW2d 33 (2021). To establish plain error requiring reversal, a defendant must show that "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Carines*, 460 Mich at 750. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity, or public reputation of the judicial proceedings' independent of the defendant's innocence." *Id.* at 763-764 (alteration, quotations marks, and citation omitted).

Addressing defendant's claim that defense counsel performed ineffectively by failing to object to the admission of other acts evidence, defendant preserved this issue for appeal, filing a motion for remand. *Abcumby-Blair*, 335 Mich App at 227. Nevertheless, our review of defendant's ineffective-assistance claim is limited to mistakes apparent on the record. *Id.*

"In order to obtain a new trial because of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that [the] outcome would have been different." *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023) (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quotation marks and citation omitted). Moreover, "counsel is not ineffective for failing to raise meritless or futile objections." *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015).

## B. ANALYSIS

We conclude that defendant has abandoned these claims by failing to identify and support her arguments with proper citations to the record. As the appellant, defendant has the burden of identifying a factual basis in the lower court record for her appellate arguments. *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). And under MCR 7.212(C)(7),[17] the *argument* section of an appellant's brief *must* contain specific page references to the record. Defendant's sole citation to the record is in her statement of preservation. In her reply brief on appeal, defendant points to record citations contained in her initial appellate brief's statement of facts to support her claims, but this is insufficient under MCR 7.212(C)(7). "Because defendant has not supported [her] argument with citations to the record, as required by MCR 7.212(C)(7), we need not consider this argument." *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). Simply put, "[d]efendant may not leave it to this Court to search for a factual basis to sustain or reject [her] position." *Id.* (quotation marks and citations omitted).

But even if we overlooked this deficiency, appellate relief is not warranted. MRE 404 governs the admissibility of other-acts evidence. The general rule under MRE 404(b) is that

---

[17] "Facts stated must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court."

-18-

evidence of other crimes, wrongs, or acts is inadmissible to prove a propensity to commit such acts. Such evidence may, however, be admissible for other purposes under MRE 404(b)(1):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Other-acts evidence may be admitted if it is offered for a proper purpose under MRE 404(b), the evidence is relevant, the probative value of the evidence is not substantially outweighed by unfair prejudice, and, upon request, a limiting instruction may be read to the jury. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993). "Other-acts evidence is logically relevant if two components are present: materiality and probative value." *People v Denson*, 500 Mich 385, 401; 902 NW2d 306 (2017). Materiality means that other-acts evidence must be related to any fact that is of consequence. *Id*. And evidence is probative if it makes the existence of a consequential fact more probable than it would be without the evidence. *Id*. It is well established that "all elements of a criminal offense are in issue when a defendant enters a plea of not guilty." *People v Spaulding*, 332 Mich App 638, 650; 957 NW2d 843 (2020) (quotation marks and citation omitted). Moreover, "[e]vidence is not unfairly prejudicial under MRE 403 merely because it damages a party's case." *People v Buie*, 298 Mich App 50, 73; 825 NW2d 361 (2012). "Rather, undue prejudice refers to an undue tendency to move the tribunal to decide on an improper basis." *Id*. (quotation marks and citation omitted.) Finally, unpreserved nonconstitutional issues, such as the erroneous admission of evidence, *People v Whittaker*, 465 Mich 422, 426; 635 NW2d 687 (2001), are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763. Generally, this requires a showing of prejudice, meaning "that the error affected the outcome of the lower court proceedings." *Id*. at 763. Defendant bears the burden of establishing prejudice. *Id*. "Reversal is only warranted when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity of public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (alterations, quotations marks and citation omitted).

Additionally, "[o]ther-acts evidence may be admissible without regard to MRE 404(b) if the other acts are so intertwined with the charged offense that they directly prove the charged offense or their presentation is necessary to comprehend the context of the charged offense." *Spaulding*, 332 Mich App at 650, citing *People v Sholl*, 453 Mich 730, 741-742; 556 NW2d 851 (1996), and *People v Jackson*, 498 Mich 246, 262-263; 869 NW2d 253 (2015). "Such evidence is also admissible to fill what would otherwise be a chronological and conceptual void regarding the events to the finder of fact." *Spaulding*, 332 Mich App at 650.

In defendant's argument preservation section the only record citation is to defense counsel's relevancy objection to the prosecutor's cross-examination of defendant about the reason Animal Control was at her property. On direct examination, defense counsel had asked defendant if she knew why Animal Control came out on December 17th. Defendant answered:

They had a complaint on the animals' condition, which ones were new, which ones had been to the vet. They wanted to see all of the animals and discuss them.

On cross-examination, the prosecutor followed up on this testimony, asking whether Animal Control came out because the "horses were thin." Defendant answered that "they had a complaint" and they discussed the horses, inquiring whether they had been to the veterinarian and what the veterinarian had said. Later, the prosecutor continued to follow up, asking whether the "horses were thin." Defendant answered: "There were a couple that were thin." The prosecutor then asked whether "[t]hey were unhealthily thin" and defendant responded: "Two of them came in together thin and got worse and we were working with the vet to figure out what was going on." The prosecutor then asked if defendant "accepted responsibility for the unhealthy condition of those horses," drawing a relevancy objection from defense counsel. Although the trial court overruled the objection, it cautioned the prosecutor to limit herself to the nature of the complaint. The prosecutor then asked about "the nature of the complaint" made, and defendant responded: "Thin horses."

After Egleston testified that her complaint to Animal Control was based on the thinness of the horses she observed on defendant's property, the prosecutor was entitled to probe defendant's initial testimony about her understanding of the reason that Animal Control visited her property. "In general, where a defendant takes the stand and testifies in [her] own defense, [her] credibility may be impeached and [her] testimony assailed like that of any other witness[.]" *People v Fields*, 450 Mich 94, 110; 538 NW2d 356 (1995) (footnote, quotation marks, and citation omitted). The prosecutor may therefore cross-examine a defendant testifying as a witness regarding any issue in a case, including credibility. *People v Reid*, 233 Mich App 457, 477; 592 NW2d 767 (1999). In any event, photographs of certain horses were admitted and videos were played so that the jury saw the horses' condition. Defendant herself testified that two of the horses were thin and Carr confirmed that two horses were going to be taken to a vet for assessment. Thus, defendant has not established that she was entitled to a new trial or that counsel was ineffective for failing to object to the prosecutor's proper cross-examination.

In defendant's reply brief, she identifies three additional instances where other acts evidence was improperly admitted, without objection from defense counsel, to show that she "abused horses and forged contracts[.]" More specifically, defendant points to: (1) Animal Control Officer Carr's[18] testimony that he had obtained "several" search warrants for defendant during his career, (2) Egleston's testimony that if Egleston had engaged with defendant about purchasing animals, it was only because Animal Control had informed her that defendant had a " 'history of' abusing horses,"[19] and (3) during Haven's testimony, Haven "accused [defendant] forging

---

[18] Defendant identifies Carr as the officer in charge, but Wiseley was the lead Animal Control Officer on Egleston's complaint.

[19] In answering the prosecutor's question whether Egleston had "promised [defendant] that [she] would PayPal her any money," Egleston answered:

If I did, it was only so the horses would stay on the property so animal control could seize them. It was just to keep them there. Because once I reported them to animal

-20-

contracts for the horses when she testified that defendant " 'wrote up the contracts [admitted as exhibits] for the horses and back dated them' to make it look like [Haven] owned [the horses] all along." The citations defendant provides in her reply brief do not sufficiently identify her argument. None of them refer to testimony that she abused animals,[20] and defendant fails to cite the page showing what the contracts between defendant and Haven said or even where they were admitted. Again, "[d]efendant may not leave it to this Court to search for a factual basis to sustain or reject [her] position." *People v Traylor*, 245 Mich App 460, 464; 628 NW2d 120 (2001) (quotation marks and citation omitted). Further, defendant "may not merely announce [her] position and leave it to this Court to discover and rationalize the basis for [her] claims." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.").

Again, even if we disregarded these deficiencies, defendant is not entitled to relief. Beginning with Carr's testimony about search warrants, to the extent that this testimony suggested prior involvement with Animal Control, it revealed nothing further and the prosecutor quickly moved on from Carr's response to focus on the search warrant related to the seizure that resulted in the forfeiture hearing and the perjury charge.

---

control, animal control said: Well, look, you know, she has a habit of once she knows that we're on to her, she will move those horses to a different location so we can't seize them or even make a case because she does not want – you know, she has a history of this.

[20] We recognize that in defendant's initial statement of facts, appellate counsel asserted that "[a]n officer said that they were there to seize the horses because there were 'some issues with animal neglect.' " From the citation provided, this quotation was attributed to Deputy Ouwinga; however, the actual exchange was:

Q [The prosecutor]. Were you employed with the Newaygo County Sheriff's Office on December 19th, 2019?

A. Yes, ma'am.

Q. Okay. And did you assist animal control at all on that day?

A. Yes, ma'am.

Q. Do you recall what you assisted them with?

A. I assisted in the collection and the search warrant on a premises that had **some issues with animal neglect that day**. It was about approximately 11:00 o'clock in the morning. (Emphasis added.)

Understandably, appellate counsel has not pursued this contention in defendant's reply brief.

Defendant has not established that she is entitled to relief. *Carines*, 460 Mich at 763-764. Further, this Court has recognized that "[d]eclining to raise objections can often be consistent with sound trial strategy." *People v Unger*, 278 Mich App 210, 253; 749 NW2d 272 (2008). In this case, counsel may have opted not to object and draw to attention Carr's testimony given that the prosecutor quickly refocused Carr. More likely, however, defense counsel may not have objected to Carr's testimony because it was consistent with defense counsel's theme in closing argument that "they [Animal Control, law enforcement, and the prosecutor] wanted [defendant] from the beginning and there is no question about that." In defense counsel's view, this pursuit of defendant included Carr and Lundeen forcing Haven "into a corner" and making it clear to her that disavowing her prior statements and testimony that she had a deal with defendant to purchase certain horses would be to her advantage. If so, "utilizing a sound trial strategy that eventually fails does not constitute ineffective assistance of counsel." *People v Bart (On Remand)*, 220 Mich App 1, 15 n 4; 558 NW2d 449 (1996). See also *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020) ("A strategy is . . . not ineffective because it entails taking calculated risks, especially if the range of available options for the defense is meager.")

Addressing Egleston's testimony, it was not that defendant had a history of abusing horses but moving them before Animal Control could act. For the reasons just discussed, defense counsel's failure to object was consistent with his theory that Animal Control was essentially out to get defendant by pursuing an unwarranted perjury charge. Defendant is not entitled to relief on this claim.

Finally, defendant claims that defense counsel was ineffective for failing to object to Haven's testimony that defendant "forged" four contracts between them because it was other acts evidence. Review of the record shows that Haven did not use the term "forge" or "forged." During trial, however, Detective Lundeen testified that although he had looked at the possibility that the contracts bore forged signatures, the witnesses' testimony confirmed "that wasn't the case." Haven merely testified that defendant "wrote up" the contracts, "back dated them[,]" and asked Haven to sign them, which she did. The contracts were admitted.[21] According to Haven, three contracts reflected that they were signed on the 18th, and one of those was amended on the 19th. A fourth contract was dated the 19th. Haven testified that she did not pay the price for the horses reflected in those contracts. On cross-examination, Haven admitted that she did not know when defendant wrote the contracts, and she could not recall whether she had seen defendant sign them.

At the perjury trial, Haven admitted that during the forfeiture hearing, she had testified that she and defendant had a verbal agreement to purchase some horses. Haven had also testified that defendant needed money and wanted to execute the contracts, so Haven did. Haven further testified that she gave defendant a saddle as part of the payment. At the perjury trial, Haven testified that the saddle belonged to defendant at that time. See footnote 8.

At issue in this case was whether defendant knowingly falsely testified at the forfeiture hearing that she did not know that Animal Control officers were at her property until she looked out the window and went outside. As already discussed, defendant's phone records confirm that

---

[21] The appellate prosecutor informed this Court that these contracts "are missing" and, therefore, "unavailable for appellate review."

within minutes of Animal Control executing a search warrant with the assistance of the Sheriff's Department, defendant called and texted with her husband, had short conversations with Haven, and unsuccessfully called Deems before texting her to "[t]ell them that you own Legacy and Tipsy. You bought them Monday [i.e., three days before the seizure]." And, after Haven arrived on defendant's property while the search warrant was being executed, Haven informed Carr that she owned four of the horses in addition to the bay mare she had earlier reported owning.

The evidence of these contracts for the sale of horses was properly admitted. *Spaulding*, 332 Mich App at 650. Further, "[s]uch evidence was . . . admissible to fill in what would otherwise be a chronological and conceptual void regarding the events to the finder of fact." *Id*. This was not improper character evidence under MRE 404(b), but proper to show defendant's motive, knowledge, or intent to perjure herself during the forfeiture proceeding related to the seizure of horses from her property. Further, the probative value of this evidence was not substantially outweighed by a danger of unfair prejudice. MRE 403. Accordingly, counsel was not ineffective for failing to raise a meritless objection. *Putman*, 309 Mich App at 245.

Affirmed.

/s/ Anica Letica
/s/ Stephen L. Borrello
/s/ Michelle M. Rick

-23-